

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **LESTER M. DEAN, JR.,** | **WD78359** |
| **Appellant,** | **OPINION FILED:** |
| **v.** | **December 15, 2015** |
| **RICHARD W. NOBLE, ET AL.,** | |
| **Respondents.** | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable James Dale Youngs, Judge**

**Before Division Two:**
**Mark D. Pfeiffer, P.J., Lisa White Hardwick, and James Edward Welsh, JJ.**

Lester M. Dean appeals the circuit court's dismissal of his petition against Richard W. Noble, ARN, L.L.C., and Wilanna R. Kiefer (collectively, "the Respondents") for fraud and related claims. Finding that Dean's claims are barred by the statute of limitations, we affirm.

## Background[1]

In 1989, Lester Dean and three others, Don Maddux, Louis Steele, and Douglas Patterson, formed Royal Main Partners, LP ("the Partnership") in order to acquire and develop property at 37th and Main Streets in Kansas City. Under the original terms of the Partnership,

---

[1]We derive the background information from Dean's petition. In reviewing a dismissal, we treat all facts alleged in the petition as true and construe the allegations favorably to the plaintiff. *See Bachtel v. Miller Cty. Nursing Home Dist.*, 110 S.W.3d 799, 801 (Mo. banc 2003).

Dean, Maddux, and Steele each owned a 30% general interest and a 1.66% or 1.67% limited interest, and Patterson owned a 5% limited interest. The development was completed in the spring of 1990, after which an office supply chain leased the building and continued as a tenant throughout this lawsuit.

In 1990, Dean pledged his interests in the Partnership as collateral for a loan from Dean Realty Company (his father's business). Dean Realty subsequently transferred the loan to Certified Business Systems ("CBS"). When Dean defaulted on the loan, CBS sued him. Dean hired Respondent, Richard Noble, to defend him in that lawsuit. Noble, a Missouri attorney, was married to Dean's sister at the time, and Dean considered him a friend.

In November 1996, while the CBS suit was pending, Noble represented Dean in a lawsuit against two of his partners, Maddux and Steele. The parties eventually entered into a settlement agreement, under which Dean would purchase Maddux's and Steele's combined shares in the Partnership, giving him a 95% ownership interest.

Noble advised Dean to transfer the Partnership interests that he was going to acquire from Maddux and Steele to him (Noble) until the CBS lawsuit was resolved. Noble told Dean that he would hold the interests until the appropriate time and would then return them at Dean's request. Dean told Noble that he wanted something in writing to confirm that Noble would, in fact, return the Partnership interests to him. Although the agreement was *not* memorialized in writing at that time, Dean alleges that the parties, nevertheless, "moved forward" with the plan for Noble to "hold" a 60% general interest and a 3.32% limited interest for Dean until the CBS lawsuit was concluded.[2] Dean retained his original 30% general and 1.66% limited interests.

---

[2]It is not clear how (or when) the actual transfer of those interests to Noble was effectuated.

Dean alleges that in July 1999, after the settlement with his partners was complete, he prepared a document memorializing his agreement with Noble to ensure that Noble would return the newly acquired Partnership interests to him. He claims that Noble later modified that document, creating a "Transfer Agreement," which Dean attached to his petition as Exhibit A. The Transfer Agreement was signed by both Noble and Dean on July 14, 1999. It gave Dean the right to purchase all of Noble's interests in the Partnership for $10, provided that (1) CBS's lien was extinguished "or adequately dealt with to [Dean]'s satisfaction" and (2) Noble was released as a guarantor of any Partnership loans.[3] It also provided that both Dean and Noble must agree on all Partnership decisions and must consent to the disbursement of any Partnership funds.

Dean claims that Noble, nevertheless, disbursed funds, made management decisions, and paid himself and his law firm over $205,000 from the Partnership, all without Dean's approval. Dean further claims that he received K-1 tax reports from the Partnership for income in excess of $111,000, but that Noble made no distributions to him with which to cover his tax liability.

In February 2007, Dean sent Noble a money order for $10 and a letter stating that the conditions of the Transfer Agreement had been met and that he was exercising his right to reacquire his Partnership interests. Noble refused to honor the Transfer Agreement. He claimed that the required conditions had not been met, and he demanded approximately $75,000 to cover his own Partnership-related tax liabilities before he would transfer the interests back to Dean.

In July 2007, Noble filed for dissolution of his marriage to Dean's sister. Also in 2007, the IRS imposed a tax lien/levy against Dean's 30% general interest and his 1.66% limited interest in the Partnership. According to Dean, the IRS was acting upon "inside information"

_____

[3]The Transfer Agreement makes no mention of the original transfer of Partnership interests to Noble.

3

provided by Noble which he had gained while acting as Dean's attorney. In October 2007, Dean paid $100,000 in taxes, and the IRS released the tax lien/levy.

On November 5, 2007, Dean filed a lawsuit against Noble seeking specific performance of the Transfer Agreement. While that suit was pending, Dean received another notice of a tax lien/levy against his interests in the Partnership in March 2008. Dean alleges that this was again the result of information provided by Noble. This notice was broader than the first, providing that the IRS was seizing "[a]ll the rights, title and interest of [Dean] as a general partner of Royal Main Partners, LP, including, but not limited to, all rights of [Dean] whether direct or indirect, whether statutory, contractual or otherwise relating to Royal Main Partners, LP." Dean engaged tax counsel to represent him in the IRS case. Dean alleges that he advised counsel that he "had the funds to pay the IRS in full" but would rather have the amount mitigated or make payments.

With the taxes still unpaid, the IRS scheduled a sale of all of Dean's rights and interests in the Partnership for May 14, 2008. Dean's tax counsel advised him that the actual sale would not occur on that date, but only bids would be received. In the late afternoon of May 14th, however, tax counsel called Dean and advised him to go to the IRS first thing the next morning and pay the taxes in full because he did not have "things worked out" as he had earlier indicated.

On May 12, 2008, two days prior to the tax sale, Noble joined with his paramour, Respondent Kiefer, to form Respondent ARN, L.L.C. ARN is a Missouri limited liability company that is 5% owned by Noble and 95% owned by Kiefer. Dean alleges that Noble and

4

Kiefer formed ARN as "the vehicle in which to execute [Noble's] scheme to divest [Dean] of his interest in [the Partnership]."[4]

According to Dean, ARN was the sole bidder at the tax sale, and the IRS sold all of Dean's interests in the Partnership (including "all rights . . . whether direct or indirect, whether statutory, contractual or otherwise") to ARN for $54,144.20. To finance the purchase, Noble used a line of credit for another company that he controlled and then loaned that money to ARN. Noble later transferred his own interest in the Partnership (which he once valued to a bank at $1.26 million) to ARN for $10, thereby giving ARN 95% ownership.

The day after the tax sale, Dean went to the IRS offices, as tax counsel had advised, to pay the taxes in full. The sale to ARN already had taken place, however, and tax counsel was unsuccessful in having the sale set aside.

Noble thereafter sought summary judgment in Dean's specific performance case against him, arguing that, because ARN had purchased all of Dean's rights and interest in the Partnership at the tax sale, Dean lacked standing to assert any claims relating to the Partnership as he had no ownership interest in it and no right to purchase Noble's interest in it.[5] On October 8, 2008, the circuit court granted Noble's motion for summary judgment. This Court affirmed via a *per curiam* order and memorandum opinion. *Dean v. Noble,* 299 S.W.3d 5 (Mo. App. 2009).

On May 13, 2013, Dean filed a lawsuit against the Respondents, asserting claims related to the loss of his rights and interests in the Partnership. Dean's initial petition asserted claims for fraud, fraud requiring the imposition of a constructive trust, tortious interference with contracts,

---

[4]Dean also claims that ARN was formed because, around this same time, Noble was enjoined in his dissolution of marriage case "from transferring, concealing, or in any way disposing of any property except in the usual course of business or for the necessities of life." Noble's dissolution of marriage was finalized in July 2010.

[5]Dean suggests that Noble was less than forthcoming with the court because he failed to inform the judge of his connection to ARN; Dean does not indicate whether the court was otherwise made aware of that fact.

conversion, replevin, unjust enrichment, and breach of fiduciary duty. He voluntarily dismissed his suit on August 16, 2013, and refiled it on August 14, 2014.[6] The new petition asserted the same claims but also asserted a new claim for conspiracy. The claim for breach of fiduciary duty is alleged solely against Noble; the other seven counts are alleged against all the Respondents.

Noble filed a motion to dismiss, arguing that Dean failed to state a claim upon which relief could be granted, because (1) all of the claims were barred by the five-year statute of limitations in section 516.120, RSMo,[7] (2) Dean lacked standing to bring any of his claims due to his lack of current ownership in the Partnership, and (3) Dean failed to properly plead a claim for conspiracy. The circuit court granted Noble's motion without explanation, dismissing all claims with prejudice. A month later, Respondents Kiefer and ARN filed a motion to dismiss, asserting the same grounds as Noble plus the additional ground that the derivative conspiracy claim was barred because the underlying claims against Noble were dismissed. The circuit court again granted the motion to dismiss without explanation.

## Discussion

Dean raises two points on appeal. In Point I, he contends that the circuit court erred in dismissing his petition based on the Respondents' argument that the claims were barred by the applicable statute of limitations. In his second point, Dean contends that the circuit court erred in dismissing his petition on the basis that he lacked standing to raise the claims set forth therein. Finding Point I to be dispositive, we limit our discussion to it.

---

[6]Dean refiled his case within a year to qualify under the "savings clause" in section 516.230, RSMo, which permits any action that was initially timely filed to be refiled within one year if the plaintiff "suffer[s] a nonsuit."

[7]Statutory references are the Revised Statutes of Missouri (RSMo) 2000.

6

### Standard of Review

We review the grant of a motion to dismiss *de novo*. *Phelps v. City of Kansas City*, 371 S.W.3d 909, 912 (Mo. App. 2012). "[T]he pleading is granted its broadest intendment, all facts alleged are treated as true, and it is construed favorably to the plaintiff to determine whether the averments invoke substantive principles of law which entitle the plaintiff to relief." *Farm Bureau Town & Country Ins. Co. v. Angoff*, 909 S.W.2d 348, 351 (Mo. banc 1995). When the trial court does not state a basis for dismissal, we presume that it was based on the grounds alleged in the motion to dismiss; we will affirm if the dismissal is proper under any of the grounds stated in the motion. *Damon v. City of Kansas City*, 419 S.W.3d 162, 176 (Mo. App. 2013).

### Point I: Statute of Limitations

In Point I, Dean contends that the circuit court erred in dismissing his claims for fraud, conspiracy, and constructive trust[8] as time-barred, because the five-year statute of limitations for a fraud claim in section 516.120(5) does not begin running until the plaintiff *discovers* the fraud. He claims that his petition demonstrates that he did not discover that the Respondents had defrauded him until May 15, 2008, when he discovered that they had purchased his rights and interest in the Partnership at the tax sale. Thus, Dean argues, his initial petition filed on May 13, 2013, was filed within five years of the date that he "discovered" the fraud. Dean also asserts that, because the constructive trust and conspiracy claims are derivative of the fraud claim, since the fraud claim was timely, then those claims also are timely.

---

[8]Dean does not contest the court's dismissal of his other claims and, thus, we do not address them. Unlike his *fraud* claim, Dean's other claims "accrued" when they became "capable of ascertainment," pursuant to section 516.100, RSMo, and, thus, would have accrued earlier than the fraud claim. *See Schwartz v. Lawson*, 797 S.W.2d 828, 832 (Mo. App. 1990).

7

Whether a statute of limitations bars an action is reviewed *de novo*. *Bateman v. Platte County*, 363 S.W.3d 39, 42 (Mo. banc 2012). If it clearly appears from the petition that a cause of action is barred by a statute of limitations, a motion to dismiss on that ground is properly sustained. *Klemme v. Best*, 941 S.W.2d 493, 497 (Mo. banc 1997).

The controlling statute of limitations for a cause of action on the ground of fraud is found in section 516.120. *Id.* It states that one of the claims that must be brought "within five years" is

> [a]n action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.

§ 516.120(5). Thus, under subsection (5), "all fraud claims must be brought within five years from when the cause of action accrues, which is either when the fraud is discovered or at the end of [ten] years after the fraud takes place, whichever occurs first." *Ellison v. Fry*, 437 S.W.3d 762, 769 (Mo. banc 2014) (citing § 516.120(5)). If the fraud is not discovered within ten years, then the cause of action is barred, in any event, after fifteen years of its commission. *Schwartz v. Lawson*, 797 S.W.2d 828, 832 (Mo. App. 1990). "A cause of action for fraud **accrues** at the time the defrauded party discovered *or in the exercise of due diligence should have discovered* the fraud." *Larabee v. Eichler,* 271 S.W.3d 542, 546 (Mo. banc 2008) (internal quotes and citation omitted) (emphasis added). A plaintiff has a duty to make inquiry to discover facts surrounding the fraud and is deemed to have knowledge of the fraud when he possesses the **means** of discovery. *Schwartz*, 797 S.W.2d at 832. Where a fiduciary relationship exists, however, "only the **actual** discovery of the fraud serves to begin the limitations period." *Cmty. Title Co. v. U.S. Title Guar. Co., Inc.*, 965 S.W.2d 245, 252 (Mo. App. 1998) (citing *Gilmore v. Chicago Title Ins. Co.*, 926 S.W.2d 695, 699 (Mo. App. 1996); *Burr v. Nat'l Life & Accident Ins. Co.,* 667 S.W.2d 5, 7 (Mo. App. 1984)).

8

The nine essential elements of fraud are:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.  *Stander v. Szabados*, 407 S.W.3d 73, 81 (Mo. App. 2013).

In Dean's Count I for "Fraud," he alleges, *inter alia*, that Noble represented to him that he would hold Dean's interest in the Partnership for Dean's benefit; that he would return Dean's interest in the Partnership upon Dean's request; that he was agreeing to do all these things for the sole benefit of Dean; and that he could be trusted.  Dean alleges that these representations by Noble were false and that Noble refused to transfer back to Dean the agreed upon partnership interest upon Dean's demand.  He further alleges that Noble never intended to transfer back to Dean the Partnership interests as provided for in the Transfer Agreement and that he knew that his statements were false or made with a reckless disregard for their truth or falsity.  Dean asserts that Noble's statements were material to his decision to execute the Transfer Agreement, in that he relied on Noble's statements and representations that the partnership interest would be returned to him in making his decision to follow Noble's advice and execute the Transfer Agreement; that Noble intended for Dean to rely on his statements and representations; and that it was reasonable for Dean to rely on the statements and representations made by Noble given the attorney-client relationship, the family relationship, and the friendship between them.  Finally, Dean alleges that, as a direct and proximate result of Noble's representations, he has sustained actual damages, including lost title to his interests in the Partnership (valued in excess of $1.2 million at the time of transfer); loss of income and earnings from his Partnership interests

9

exceeding $75,000; loss of return on his investment in the Partnership; and loss of business opportunities due to lost Partnership cash flow and capital.

The foregoing allegations establish all of the necessary elements for fraud, and all relate to Noble's promise that he would convey the interests in the Partnership back to Dean pursuant to the Transfer Agreement and his failure to do so. Because there was a fiduciary relationship between attorney Noble and his client Dean, Dean's fraud claim would have "accrued" when Dean *actually* discovered "the facts constituting the fraud." *See Cmty. Title*, 965 S.W.2d at 252. Based on the facts alleged in his Petition, it is clear that Dean discovered "the facts constituting the fraud," -- *i.e.*, that Noble's representations were not true -- when Noble refused to return the interests in response to Dean's February 2007 letter, and certainly no later than November 2007, when Dean filed his first lawsuit against Noble.[9]

While the foregoing allegations detail the only specific instances of actual fraud, in an effort to fit within the five-year statute of limitations, Dean alleges other purportedly fraudulent acts related to the tax sale that took place after November 2007. Dean alleges (1) that the Respondents "scheme[d] to orchestrate the levy, seizure, and tax sale, and obtain [his] rights and interest in [the Partnership] at the tax sale"; (2) that they "orchestrated a scheme" to establish ARN for the purpose of "acquiring [Dean's Partnership interests] at a tax sale"; and (3) that

> [i]n furtherance of [the] scheme to divest Dean of his ownership interest in the Partnership, Noble refused, delayed and otherwise obstructed and interfered with the return of Dean's Partnership interest because, had that interest been timely returned to Dean, then Dean would have had access to the Partnership's cash and

---

[9]The other two Respondents had no fiduciary relationship with Dean; thus, his fraud claims against them would have accrued when he "discovered *or in the exercise of due diligence should have discovered* the fraud." *See Larabee,* 271 S.W.3d at 546. "Actual discovery" could never occur earlier than when the plaintiff "in the exercise of due diligence *should have discovered* the fraud." Consequently, because Dean's actual discovery fell outside the statute of limitations, then the fraud claims against the other two Respondents would also necessarily be time-barred.

other assets in which to satisfy any tax liabilities he may have owed, and thus the IRS lien/levy would not have issued.

Not only does Dean fail to plead any specific instances of actual fraud in these conclusory allegations, but his own petition refutes his claims that he was somehow forced into a tax sale by the Respondents. In Paragraph 107, he alleges that he "***had the funds to pay the IRS in full*** . . . but would rather have the amount mitigated or put on a payment schedule." In Paragraph 111, Dean again alleges that he "***had the ability to pay the IRS taxes in full on or before May 14, 2008***, and would have done so had he been advised by tax counsel." (Emphasis added.) Thus, his petition clearly shows that, despite his claim that Noble "orchestrated" the IRS sale, there would have been no IRS sale if he had paid his taxes with the money that he admittedly had available. It is unclear how his own failure to pay his taxes, when he had the money to do so, was "orchestrated" by the Respondents. In any event, even if the Respondents' "scheme" to defraud Dean out of his Partnership interests included purposely withholding Partnership funds from Dean to prevent him from paying his taxes, Dean would have been aware of this when he received the K-1's or, *at the latest*, when he received the IRS's notice of his tax deficiency. *See Thomas v. Grant Thornton LLP*, No. WD78122, --- S.W.3d ---, 2015 WL 5823028, at *5 (Mo. App. W.D. Oct. 6, 2015) (citing *Nerman v. Alexander Grant & Co.*, 926 F.2d 717, 721 (8th Cir. 1991)) (the Thomases' claim for fraudulent misrepresentation accrued when they received the notices of tax deficiency, which "alerted [them] to the facts giving rise to their fraud claim").

Besides his primary fraud claim, Dean also contests the dismissal of his claims for constructive trust and conspiracy. He asserts that, because neither constructive trust nor conspiracy "are . . . stand-alone claims, but instead depend on his fraud claim, [if] his fraud claim

11

was timely, [then] those dependent claims were equally timely, too."[10]  We agree, but we note that the converse, of course, also is true.  Thus, because the fraud claim was properly dismissed as time-barred, the derivative constructive trust and conspiracy claims against all the Respondents also were properly dismissed.

In conclusion, because it clearly appears from the petition that Dean's claims are barred by the applicable statute of limitations, the circuit court did not err granting the Respondents' motion to dismiss.  Accordingly, we affirm the circuit court's judgment.

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.

---

[10]*See Kerber v. Rowe*, 156 S.W.2d 925, 927-28 (Mo. 1941) (a constructive trust is dependent upon an underlying claim, such as fraud or breach of fiduciary duty, and application of a statute of limitations is determined by the nature of the claim); *Gettings v. Farr*, 41 S.W.3d 539, 542 (Mo. App. 2001) ("if the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, then the conspiracy claim also fails").